FILED'07 JUL 20 12:02USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ARTHUR JAMES WAGNER,                              CV. 05-1729-PK

                         Plaintiff,              FINDINGS AND
                                                 RECOMMENDATION
v.

PACIFIC MARITIME ASSOCIATION,
a California nonprofit corporation;
INTERNATIONAL LONGSHORE WORKERS
UNION (ILWU), ILWU, LOCAL 92; and the
WALKING BOSSES JOINT LABOR
RELATIONS COMMITTEE OF PORTLAND
OREGON,
                         Defendants.

_____

PAPAK, Magistrate Judge:

        Plaintiff Arthur James Wagner, a longshore worker and registered member of

International Longshore Workers Union ("ILWU") Local 8, filed this lawsuit alleging age

discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.

§ 623(a)(1) and (2), and ORS Chapter 659A, two claims of breach of contract, two claims of

Page 1 - FINDINGS AND RECOMMENDATION

breach of the covenant of good faith and fair dealing, negligent misrepresentation, and equitable

estoppel.  Wagner's claims all arise out of the scoring process that was used in 2003 and 2004 to

select new "walking bosses" (foremen) for the Port of Portland. Before the court is defendant

Pacific Maritime Association's ("PMA") motion for summary judgment, moving for judgment on

each of Wagner's ten claims for relief.[1] For the reasons set forth below, PMA's Motion for

Summary Judgment (No. 39) should be granted in part and denied in part.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary

judgment:

> if the pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, show that
> there is no genuine issue as to any material fact and that the
> moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).When considering a motion for summary judgment, the district court's role

is not to weigh the evidence, but merely to determine whether there is a genuine issue for trial.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Freeman v. Arpaio*, 125 F.3d 732,

735 (9th Cir. 1997).

A party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of the record which it

believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986).  Only after the moving party has made such a showing does the burden

---

[1]PMA has also filed a motion to strike the declaration of Wagner's expert, Roy Katzen
(No. 65). A separate order addressing that motion is filed concurrently herewith.

Page 2 - FINDINGS AND RECOMMENDATION

shift to the opposing party to show that a genuine issue of fact remains. *See* Fed. R. Civ. P. 56(e).

To establish the existence of a genuine issue of material fact, the non-moving party must make an adequate showing as to each element of the claim on which the non-moving party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 322-23; *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Harper*, 877 F.2d at 731. The opposing party may not rest on conclusory allegations or mere assertions, *see Taylor*, 880 F.2d at 1045; *Leer v. Murphy*, 844 F.2d 628, 631 (9th Cir. 1988), but must come forward with significant probative evidence, *see Anderson,* 477 U.S. at 249-50; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Taylor*, 880 F.2d at 1045. In evaluating a motion for summary judgment, the court must construe all facts and draw all inferences in the light most favorable to the non-moving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g. Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990).

## FACTUAL BACKGROUND

Arthur Wagner is currently sixty-five years old, with a birth date of February 22, 1942. At the time of his application for the position in question here, Wagner was sixty-one years old.

Wagner was first registered as a Class B Longshore Worker for the International Longshore Workers Union (ILWU) Local #8 in 1964. He became a Class A Registered Longshore Worker in 1969. Plaintiff worked in several areas, including work on the log raft

("boom/raft") as well as becoming a crane/winch operator in 1983. Crane/winch operation is a highly coveted field as the pay and the hours are good. It comes, however, with certain restrictions. Crane/winch operators must take available crane jobs first. If no crane/winch jobs are available, then crane/winch operators must wait until all the other longshore workers receive their daily assignments before they can receive an assignment for the day. Practically, this process results in limited diversity of jobs available to a longshore worker once he becomes a crane/winch operator.

PMA is a multi-employer bargaining association. Its members are steamship, stevedoring and marine terminal operating companies on the West Coast. PMA represents them in collective bargaining with the ILWU and in union contract administration. Wagner and other longshore workers load and unload cargo aboard ocean-going vessels for employer-members of PMA.

Prior to 2003, walking bosses at the Port of Portland were selected from the longshore worker's rank in Portland off a list of preferred "casual" (fill-in) foremen. In 2003, the maritime industry's joint labor-management committee at the Port of Portland (the "JLRC"), at PMA's instance, instituted a more open and formal walking boss selection process. By letter dated April 2, 2003, Joe Weber, the Pacific Northwest Area Manager for PMA, on behalf of the JLRC, notified all Class A longshore workers who had been registered for more than ten years, including Wagner, that longshore workers would be transferred/promoted to walking boss status "in the near future as the needs of the port dictate." Weber explained that a new application, criteria and process had been developed and attached copies of the application, Walking Boss Selection Criteria, and Walking Boss Selection Process. Weber also stated that the list of individuals who completed and submitted applications by the April 25, 2003 deadline would be

Page 4 - FINDINGS AND RECOMMENDATION

kept on file through calendar year 2004, and that "[s]hould additional Walking Boss registrations

be needed (as determined by the JLRC in its sole discretion) during this period of time,

individuals will be selected from this pool of applicants applying the Walking Boss Selection

Criteria, and Walking Boss Selection Process."

     The Walking Boss Selection Process consisted of an initial screening, evaluation, and

interview. The initial screening stage simply required interested longshore workers to submit an

application. The evaluation stage ranked applicants on the basis of seven categories: (1) number

of employer complaints; (2) total hours worked in previous four years; (3) hours worked in

diverse occupation codes; (4) total walking boss hours in past four years; (5) total walking boss

hours for a broad range of employers; (6) skill training; and (7) number of years in the industry.

Prior to 1976, no records were kept that established the different type of work done by longshore

workers. Category (3), therefore, only took into account the diversity of work since 1976. To

offset this problem, PMA allowed for unlimited points to be given for years of experience in

category (7) (as other Ports, upon which this scoring criteria was based, capped seniority at 10

points). Applicants with the highest scores would then undergo a written test and oral interview

and could score a maximum of 15 points for each.

     PMA decided to hire five new walking bosses in 2003, two in July and three in

November. Based on the composite scores for the criteria, written test, and interview, Wagner

was initially ranked fifth of all the candidates. After the top two candidates were promoted to

walking boss in July, Wagner was in line to be promoted in November. After the July

promotions, however, PMA received at least one complaint regarding a scoring error, filed by

candidate J.W. Evans. Based on this complaint, PMA re-scored the 2003 applications. In this

process, Wagner received two additional points in the category "hours worked." However, another candidate, D. Mosher, received three additional points in the same category and, as a result, replaced Wagner in the top five. Wagner did not get promoted in November. Shortly after the final decisions on walking boss hirings were made, Ted Musselman, one of the members on the selection committee, made the statement to another longshore worker that "Art [Wagner] doesn't have the look we want."

Following the promotions or selections in 2003, at least one female employee filed a grievance, contending that the scoring process was discriminatory against women, minorities, and those who had more recently entered the industry. In response, PMA revised its scoring system for 2004. Concluding that too much emphasis had been placed on seniority, PMA sought to de-emphasize the impact seniority had on selection. The selection criteria, both in 2003 and 2004, had uncapped points given for years of seniority. In 2003, up to 12.5 additional points were given to crane/winch operators (2.5 points for the category "diverse occupation codes" and 10 points for the "skills/training" category). Crane workers tend to be older workers with more seniority. To give workers who were not crane/winch operators and workers who had more recently entered the profession a more equal opportunity to become a walking boss, PMA eliminated the additional 12.5 points awarded to crane/winch operators. The "skills/training" points were cut completely, and the "diverse occupation codes" points were replaced by now giving 2.5 points to boom/raft work, instead of crane/winch work.

By letter dated December 10, 2003, PMA informed all candidates from 2003 that, because of the revised scoring process, they needed to reapply for the 2004 positions. Wagner did not reapply in 2004, because he believed he would not get the job without the points given for

Page 6 - FINDINGS AND RECOMMENDATION

crane experience. Wagner also believed, based on the original notice from Weber in 2003, that

his 2003 score would be used for the walking boss selection in 2004.

Following the 2004 selection process, Wagner timely filed a union grievance and a

complaint with the Equal Employment Opportunity Commission ("EEOC") and the Oregon

Bureau of Labor and Industry ("BOLI"). This lawsuit followed.

## ANALYSIS

Wagner makes claims of disparate impact and disparate treatment in connection with the

2003 and 2004 evaluation and selection process. Each claim will be analyzed separately.[2]

## I.    2003 Disparate Impact and Disparate Treatment Claims

### A. Disparate Impact

"Disparate impact" claims are those where the identified employment practices are

facially neutral in their treatment of different groups, but "in effect fall more harshly on one

group than another and cannot be justified by business necessity." *Int'l Broth. of Teamsters v.*

*United States*, 431 U.S. 324, 335 n.15 (1977). The Supreme Court has not clearly addressed

whether plaintiffs may bring disparate impact claims under the ADEA, but this circuit permits

such claims. *See Pottenger v. Potlach Corporation,* 329 F.3d 740, 749 (9th Cir. 2003); *Katz v.*

*The Regents of the Univ. of Cal.,* 229 F.3d 831, 835 (9th Cir. 2000).

To make out a prima facie case of disparate impact based on age and survive a summary

judgment motion, the plaintiff must generally show (1) the occurrence of certain outwardly

neutral employment acts or  practices, and (2) a significantly adverse or disproportionate impact

---

[2]Wagner's disparate impact claims for both the 2003 and 2004 selection process are
contained in his first count for relief and his disparate treatment claims for those same years are
contained in this second claim for relief.

on persons of a particular age produced by those acts or practices. *Spaulding v. Washington*, 740
F.2d 686, 705 (9th Cir. 1984). Formulated another way, the plaintiff must: (1) identify the
specific employment practices being challenged; (2) show disparate impact; and (3) prove
causation. *Rose v. Well Fargo and Company*, 903 F.2d 1417, 1424 (9th Cir. 1990). Instead of
pointing out a general policy that led to an adverse impact, plaintiff must point to specific
practices that are allegedly responsible for the adverse impact. *Smith v. City of Jackson*, 544 U.S.
228, 241 (2005). If the plaintiff successfully establishes a prima facie case, the burden then shifts
to the employer to establish a legitimate business justification for the specific practices. *Id.* at
242.

In the 2003 scoring, Wagner received only 7 out of 20 points in the "hours worked in
diverse occupation codes" category, despite having thirty-nine years of experience as a
longshoreman. He argues that his low score is a result of the fact that the vast majority of his
diverse work occurred pre-1976, when computerized records were not kept. Wagner alleges that
the failure to consider pre-1976 work in the diverse occupation code category had a disparate
impact on older workers. PMA points out that the "number of years in the industry" category had
no pre-1976 limitation, and that all applicants received one-half point for each year of registered
service, including years prior to 1976. Wagner had the highest score in the applicant pool for this
category in 2003 and would have had the highest score for that category in 2004, had he applied.

Wagner fails to meet his initial burden to establish a prima facie case. The focus in
disparate impact claims is normally "on statistical disparities, rather than specific incidents, and
on competing explanations for these disparities." *Rose*, 902 F.2d at 1424 *quoting Watson v. Forth
Worth Bank & Trust*, 487 U.S. 977 (1988). Wagner must offer some statistical evidence of a kind

and degree that shows that the practice in question had a significant impact on the protected class

of people. *Rose*, 902 F.2d at 1424. Wagner has produced no statistical evidence to prove

disparate impact and cannot survive summary judgment. *See Katz*, 229 F.3d at 835 (summary

judgment appropriate where plaintiffs were unable to establish a substantial statistical disparity

that would raise an inference of discrimination); *Rose*, 902 F.2d at 1424 (summary judgment

appropriate even when statistical evidence was proffered).

Beyond a lack of statistical evidence, Wagner fails to establish a prima facie case of

disparate impact for three additional reasons. First, the failure to take into account pre-1976 work

was not a policy–it was an impossibility. Prior to 1976, PMA kept no records that in any

reasonable way would allow a comparison of a candidate's work in the various job categories that

received points.

Second, PMA made reasonable adjustments to compensate for the lack of records by

removing the cap on seniority points in the 2003 scoring[3]. The scoring system upon which the

Portland system is based originally capped seniority points at a maximum of ten. The ceiling was

removed following a complaint by a walking boss candidate in Tacoma. Thus, Wagner received

an extra 6.5 points for his work between 1964 and 1976, in the "number of years in the industry"

category.

Finally, the promotion of Frank Harvey to walking boss in 2003 undermines Wagner's

argument. Harvey, who had thirty-seven years of experience as a longshore worker[4], was older

than Wagner, and was also a crane/winch operator, was ranked sixth among all the candidates for

---

[3]Points for seniority were also unlimited in the 2004 scoring criteria.

[4]Wagner had thirty-nine years experience.

Page 9 - FINDINGS AND RECOMMENDATION

hours worked in the "diverse occupation codes" category. Like Wagner, Harvery's pre-1976 work was not considered in that calculation. Nonetheless, Harvey was the number one candidate for walking boss in 2003 and was hired for that position in July.

Because Wagner failed to establish a prima facie case of disparate impact as to the 2003 evaluation and selection process for walking bosses, summary judgment should be granted on that claim.

## B.    Disparate Treatment

"Disparate treatment" discrimination cases involve intentional discrimination by the employer against the employee; often, this occurs either in hiring criteria that facially discriminate or is established by comments or policies made or endorsed by the employer. *See McDonnell Douglas Corp., v. Green*, 411 U.S. 792, 800-801 (1973). The basic procedure and allocations of the burden of proof for Title VII cases alleging discriminatory treatment established in *McDonnell Douglas* is also applied to claims under the ADEA. *Douglas v. Anderson*, 656 F.2d 528, 531 (9th Cir. 1981). First, the plaintiff has the burden of establishing a prima facie case of age discrimination. *Id.* at 802. To establish a prima facie case under the ADEA, the plaintiff must show by a preponderance of the evidence that he applied for an available position for which he was qualified, but the circumstances in which he was rejected give rise to an inference of unlawful discrimination. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981). Second, if the plaintiff succeeds in proving a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for employee's rejections." *McDonnell Douglas*, 411 U.S. at 802. Finally, if the defendant meets his burden, the plaintiff must be given the chance to prove, by a preponderance of the evidence, that the

Page 10 - FINDINGS AND RECOMMENDATION

legitimate reasons offered by defendant were not defendant's true reasons; instead, the reasons were really a mere pretext for discrimination. *Id.* at 804. Despite the burden shifting, the ultimate burden of persuasion remains on the plaintiff at all times. *Texas Dept. of Cmty. Affairs*, 450 U.S. at 252.

In this case, Wagner has clearly established a prima facie case of age discrimination. Wagner was 61 years old at the time of his 2003 application and, thus, clearly protected under the ADEA. He was qualified for the position of walking boss; in fact, he was ranked fifth in a pool of applicants from which five candidates would be selected. And, ultimately, Wagner did not receive the promotion and it went, instead, to a longshore worker fifteen years his junior.

Likewise, PMA has articulated a legitimate, non-discriminatory reason for its actions. PMA maintains that the original 2003 evaluation and scoring process contained errors that, once brought to its attention and corrected, resulted in Wagner being ranked sixth rather than fifth. Since only the top five candidates were selected, PMA claims, the decision not to promote Wagner was based on  legitimate business considerations and not on a discriminatory motive.

To show that PMA's explanation was really a mere pretext for discrimation, Wagner offers the statement of Ted Musselman, made after the scoring had been revised and Wagner had not been selected, that "Art [Wagner] doesn't have the look we want." Wagner argues that Musselman's remark is direct evidence of a discriminatory motive and, therefore, under Ninth Circuit precedent, "a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Godwin v. Hunt,* 150 F.3d 1217, 1221 (9th Cir. 1998). PMA argues that the remark is not direct evidence of discrimination because it does not refer to age and could be interpreted as relating to other factors, such as dress or appearance.

Page 11 - FINDINGS AND RECOMMENDATION

The parties make too much of the direct evidence versus indirect evidence distinction. "'When a plaintiff does not rely exclusively on the presumption but seeks to establish a prima facie case through the submission of actual evidence, very little such evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a factfinder.'" *Schnidrig v. Columbia Mach, Inc.,* 80 F3d 1406, 1409 (9th Cir. 1996) *quoting Lowe v. City of Monrovia,* 775 F.2d 998, 1009 (9th Cir. 1985).

While Musselman's remark is not direct evidence of discrimination, because it does not directly refer to age, it is, when considered in context, substantial evidence of a discriminatory motive. It is not, as PMA suggests, a "stray remark". *See e.g., Nesbit v. Pepsico, Inc.,* 994 F.2d 703, 705 (9th Cir. 1993) (comment "we don't necessarily like grey hair" at best weak circumstantial evidence of discriminatory animus). Musselman was a member of the walking boss selection committee and he made the statement shortly after the scoring had been revised and Wagner had been replaced as one of the top five candidates by D. Mosher, a longshore worker fifteen years younger than Wagner. Furthermore, Musselman's comment referred explicitly to Wagner and wasn't of a more generalized nature. *See Hemsworth v. Quotesmith.com, Inc.,* 476 F.3d 487, 491 (7th Cir. 2007) ( a particular remark can provide an inference of discrimination  when it was "(1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action").

Whether Musselman's remark evinces a discriminatory motive on the part of PMA related to Wagner's age or actually was intended to refer to one of the other factors suggested by PMA is

ultimately for a jury to resolve. Summary judgment on Wagner's claim of disparate treatment in the 2003 evaluation and selection process should be denied.

## II.   2004 Disparate Impact and Disparate Treatment Claims

### A.   Standing

PMA challenges Wagner's standing to assert the 2004 disparate treatment and disparate impact claims because he failed to apply for a walking boss position in 2004. Wagner admits that he did not apply in 2004, but alleges that his application would have been "futile." When a non-applicant's attempt to apply for a position would have been a "futile gesture," the non-applicant may nonetheless have standing to challenge the application practices, process, or criteria. *Int'l Broth. of Teamsters*, 431 U.S. at 365-66. The Court in *Int'l Broth. of Teamsters* held that a non-applicant may pursue claims for discrimination on a showing that the non-applicant was deterred from applying by the employer's discriminatory practices. This is known as the "futility" doctrine or the "deterred-applicant" theory. Courts applying the doctrine have examined the attendant facts and circumstances of the individual case in order to determine the validity of a claim that application would have been futile. For a non-applicant to have standing, "courts look to whether a plaintiff has alleged facts that, taken as true, support the inference that it would have been futile for him to apply–not simply whether a plaintiff can allege a discriminatory practice." *Wynn v. Nat'l Broadcasting Co., Inc.*, 234 F. Supp. 2d 1067, 1099 (C.D. Cal. 2002).

Based on the facts in this case and Ninth Circuit precedent, I conclude that  Wagner's application in 2004 would not have been futile. Before allowing a non-applicant to challenge discriminatory procedures, the Ninth Circuit has required the plaintiff to show a clear pattern of discrimination. *See Bouman v. Block*, 940 F.2d 1211, 1221-22 (9th Cir. 1991) (allowing female

plaintiff to challenge procedures when there was clear pattern of discrimination against woman and plaintiff told "not to hold her breath" when she asked a superior about her chances of getting promoted); *Reed v. Lockhart Aircraft Corp.*, 613 F.2d 757 (9th Cir. 1980) (allowing plaintiff to challenge procedures when the practice was not to apply for promotions, but be approached by company); *Gifford v. Atchison, Topeka, and Sante Fe Ry Co.*, 685 F.2d 1149, 1154 (9th Cir. 1982) (allowing female plaintiff to challenge procedures despite failure to apply for promotion to "wire chief", where defendant employed no female "wire chiefs").

Here, there is no clear pattern of discrimination Wagner can identify based on age in the selection of walking bosses in Portland. Most, if not all, of the walking bosses are in their fifties, sixties, or even seventies. As the Court said in *Int'l Broth. of Teamsters*, the company must have a "consistently enforced policy" of discriminating against a certain group of individuals for a futility claim to survive. 431 U.S. at 365. Apparently unable to show a "consistent policy" of discrimination, Wagner only offers his subjective belief that, based on the elimination of points for crane/winch experience in the revised 2004 criteria, it would have been futile for him to apply. Though subjective beliefs may play a part in a futility argument, courts have never accepted a plaintiff's subjective belief to be sufficient on its own. *Wynn*, 234 F.Supp. 2d at 1102, n.25.

Because Wagner failed to apply in 2004, he does not have standing to challenge the process. However, even if Wagner did have standing, his claims of disparate impact and disparate treatment should not survive summary judgment.

### B.    Disparate Impact

Like his claim of disparate impact in the 2003 evaluation and selection process, Wagner's

Page 14 - FINDINGS AND RECOMMENDATION

disparate impact claim in 2004 fails because he has no evidence that the 2004 revised criteria adversely impacted older workers. Wagner offers no statistical evidence or objective proof of age discrimination. PMA's expert, statistician Peter Nickerson, on the other hand, has demonstrated the absence of disparate impact.[5] After conducting several statistical regressions of the 2003 and 2004 data, Nickerson concluded that there was no negative impact on the candidates based on their age in 2004. Because Wagner fails to offer his own evidence, or evidence to rebut or even question PMA's expert analysis, he has failed to establish a prima facie case. *Rose*, 902 F.2d at 1421 (even if plaintiff offers statistical evidence, statistical analysis still may be insufficient to survive summary judgment). Summary judgment, therefore, is appropriate on Wagner's disparate impact claim for 2004.

### C.    Disparate Treatment Claim

In his 2004 disparate treatment claim, Wagner has no direct evidence of intentional discrimination. If his 2004 disparate treatment claim is to survive PMA's motion for summary judgment, Wagner must establish that the circumstances surrounding the changed criteria give rise to an inference of unlawful discrimination. *Texas Dept. of Cmty. Affairs*, 450 U.S. at 252. Wagner has not offered any evidence of a discriminatory motive on the part of PMA in 2004. He concedes that the 2004 scoring revision was a facially neutral policy–discriminatory treatment applies to policies that discriminate on their face. *Int'l Broth. of Teamsters,* 431 U.S. at 335, n.15. Since Wagner has not met this burden, he has failed to establish a prima facie case.

---

[5]Nickerson did not analyze the effect of the re-scoring (or error correcting) process in 2003, only the change in scoring criteria from 2003 to 2004.

Even if Wagner had established a prima facie case, PMA has produced evidence that its modification of the scoring in 2004 was for legitimate business reasons. *McDonnell Douglas*, 411 U.S. at 802. PMA explains the change as a result of complaints that relying too heavily on seniority could be attacked as unfair to women, minorities, and others who have more recently entered the industry. As PMA has only a burden of production, not persuasion, the burden shifts back to the plaintiff to show pretext. *Id.* Wagner, however, makes no showing or allegations of pretext. Therefore, Wagner's 2004 disparate treatment claim cannot survive summary judgment.

**III.    ORS Chapter 659A**

Wagner's third and fourth claims for relief allege age discrimination in violation of ORS 659A.030. PMA makes two arguments in favor of summary judgment on these claims. First, PMA argues that the state law claims are preempted by § 301 of the Labor Management Relations Act ("LMRA"). Both PMA and Wagner point to *Audette v. ILWU*, 195 F.3d 1107 (9th Cir. 1999) as authority for their respective positions on this issue.

In *Audette*, the plaintiff filed claims for, among other things, breach of contract and violation of Washington's anti-discrimination statute arising from an alleged breach of a settlement agreement, the breach allegedly motivated by retaliation and gender discrimination. The court noted that "[t]he LMRA does not ... preempt the application of a state law remedy when the 'factual inquiry [under the state law] does not turn on the meaning of any provision of a collective bargaining agreement,'" *id.* at 1113, *quoting Jimeno v. Mobil Oil Corp.,* 66 F.3d 1514, 1522 (9th Cir.1995) (citations omitted) and cited three Ninth Circuit cases holding that an employment discrimination claim was not preempted by § 301, *id., citing Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988) (holding § 301 did not preempt state law claim for

Page 16 - FINDINGS AND RECOMMENDATION

physical disability discrimination in employment); *Ramirez v. Fox Television Station, Inc.,* 998

F.2d 743, 748 (9th Cir.1993) (holding state law claim of discrimination based on national origin

not preempted); *Jackson v. Southern Cal. Gas Co.,* 881 F.2d 638, 644 (9th Cir.1989) (holding

state law claim of race discrimination not preempted). The court then held that in this instance,

the claim was preempted by § 301 because plaintiff had not alleged a "free-standing claim of

discrimination." *Id.* Rather, the claim turned on the interpretation of a settlement agreement that

the court had already determined implicated the collective bargaining agreement ("CBA"). *Id.* at

642.

Here, PMA argues that its defense, that it was applying equally, to all candidates, the

scoring criteria issued by the JLRC, brings this case under the §301 umbrella.  While Wagner's

state law employment discrimination claims will require reference to the selection process and

stated criteria, it does not appear that resolution of the claim will depend upon interpretation of

any provision of a collective bargaining agreement. *Audette,* 195 F.3d at 1113.  Wagner's state

law discrimination claims are not preempted by § 301.

PMA's second argument against Wagner's state law discrimination claims is that the

claims fail on the same grounds as Wagner's federal age discrimination claims. PMA and

Wagner agree that Oregon applies the same standard for establishing a prima facie case of age

discrimination as under federal law.   PMA's motion for summary judgment on Wagner's third

and fourth claims for relief should, therefore, be granted with respect to Wagner's disparate

impact claims based on the 2003 and 2004 selection process and his disparate treatment claim

based on the 2004 selection, and denied as to Wagner's disparate treatment claim based on the 2003 selection for the reasons set forth above.[6]

## IV.    Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing

Wagner alleges two claims for breach of contract (claims five and seven) and two claims of breach of good faith and fair dealing (claims six and eight). In his fifth claim, Wagner alleges that defendants breached the union contract by discriminating against Wagner. Wagner also alleges that the letter inviting applications for the 2003 selection process and stating an intent to use the list of candidates for any selection done in 2004 as well, constituted a contract which defendants breached by revising the scoring standards for the 2004 selection. In his sixth claim, Wagner alleges that defendants breached the covenant of good faith and fair dealing implied in both the union contract and the contract arising out of the letter inviting applications by adopting criteria in the 2004 selection that eliminated points for work performed as a crane operator. In his seventh claim, Wagner alleges that defendants breached the union contract by correcting the scoring errors and re-ranking the candidates in the 2003 selection because that re-scoring was motivated by age discrimination. In his eighth claim, Wagner alleges that defendants breached the covenant of good faith and fair dealing implied in the union contract by re-ranking and scoring the applicants in the 2003 process after publishing the Walking Boss Selection Criteria

---

[6]Wagner argues that under Oregon law, he need only make a prima facie case to survive summary judgment. PMA argues, and the court agrees, that federal courts sitting in diversity apply the *McDonnell Douglas* burden shifting framework to state law claims despite the fact that the Oregon courts have held that a demonstration of pretext is not required to defeat summary judgment. *Snead v. Metropolitan & Cas. Ins. Co.*, 237 F.3d 1080, 1092 (9th Cir. 2001) (applying the *McDonnell Douglas* burden-shifting scheme in federal court).

and Process, performing all of the interviews, and completing the scoring, and in requiring the

submission of new applications for the 2004 selection.

PMA argues, and Wagner concedes, that claims five through eight are preempted by §

301 of the Labor Management Relations Act ("LMRA").[7]  *See Ramirez, Inc.*, 998 F.2d at 748,

quoting *Lingle*, 486 U.S. at 405-06 ("A state-law claim is preempted by section 301 'if the

resolution of a state-law claim depends upon the meaning of a collective-bargaining

agreement.'") and *Audette*, 195 F.3d at 1112 (holding plaintiffs' state law claim for breach of the

implied covenant of good faith and fair dealing was preempted to the same extent plaintiff's

breach of contract claim was because the covenant "derives from the contract [and] is defined by

the contractual obligation of good faith").  PMA further argues, and Wagner again concedes, that

even if the breach of contract and breach of good faith and fair dealing claims are re-

characterized as § 301 claims, those claims are subject to a six-month statute of limitations.

*DelCostello v. Int'l Broth. of Teamsters*, 462 U.S. 151 (1983).  Wagner argues, however, that the

six-month limitation period is subject to tolling and should, in this case, be tolled by the timely

filing of Wagner's union grievance and subsequent discrimination complaint filed with the Equal

Employment Opportunity Commission ("EEOC") and the Oregon Bureau of Labor and Industry

("BOLI").

Wagner relies on *Whittle v. Local 641 Int'l Broth. of Teamsters, et al.*, 56 F.3d 487 (3d

Cir. 1995), wherein the Third Circuit held that the time for filing a § 301 lawsuit was tolled while

the plaintiff pursued his contractual grievance remedies.  *Id.* at 490.  Assuming without deciding

---

[7]PMA makes additional arguments in support of summary judgment on Wager's fifth,
sixth, seventh and eighth claims.  Because the issue of preemption and untimeliness is
dispositive, PMA's additional arguments will not be addressed herein.

Page 19 - FINDINGS AND RECOMMENDATION

that the Ninth Circuit would agree with the Third Circuit's analysis and holding, *Whittle* only

gets Wagner past the union grievance; it does not get him past the EEOC/BOLI complaint.

    The Seventh Circuit has held that the filing of a discrimination complaint with the EEOC

or BOLI does not toll the six-month statute of limitations for a § 301 claim. *Johnson v. Artim*

*Transp. Sys., Inc.*, 826 F.2d 538, 551 (7th Cir. 1987) ("We therefore hold that the policy

considerations do not favor, and indeed weigh against tolling the statute of limitations for a . . .

fair representation claim while Title VII charges are pending with the EEOC."). The Ninth

Circuit has not addressed this issue. In *Snyder v. Fry's Food Stores of Arizona, Inc.*, 1996 WL

806690, *3-4  (D. Ariz. 1996), *rev'd on other grounds*, 201 F.3d 445 (9th Cir. 1999), however,

the district court noted that  "[t]he Ninth Circuit equitably tolls section 301's statute of limitations

only 'when the plaintiff is required to avail himself of an alternate course of action as a

precondition to filing suit.'" *Id.* at 3.  The district court then held that the filing of an EEOC

complaint does not toll the limitation period on a § 301 claim because an EEOC filing is not a

precondition to a § 301 claim. I am persuaded by the District Court of Arizona's reasoning in

*Snyder*. I therefore hold that Wagner's § 301 claim was not tolled by the filing of his

EEOC/BOLI complaint.

    Wagner was informed on June 22, 2004 that his union grievance was denied.  Wagner

filed this lawsuit on November 14, 2005.  Even if the court were to recharacterize Wagner's

contract claims as § 301 claims, those claims would nonetheless be untimely. PMA should be

granted summary judgment on Wagner's fifth, sixth, seventh, and eighth claims for relief.

## V.    Negligent Misrepresentation

    In Wagner's ninth claim for relief, he alleges that the 2003 announcement from Weber

that (1) applications for the position of Walking Boss would be "evaluated in accordance with the attached guidelines"; (2) "submitted applications will be kept on file through calendar year 2004"; (3) "individuals will be selected [for the position of Walking Boss] from this pool of applicants, applying the Walking Boss Selection Criteria and Walking Boss Selection Process discussed" in the memo; and (4) "at the close of calendar year 2004, this list will be deleted," constituted negligent misrepresentations by PMA. PMA moves for summary judgment, arguing that there is no duty, no material misrepresentation, and no injury.

Under Oregon law, negligent misrepresentation requires that one party in a relationship owe a duty "beyond the common law duty to exercise reasonable care to prevent foreseeable harm" to the other party. *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or. 149, 159 (1992). "[T]hat kind of heightened duty arises when one party is acting, at least in part, to further the economic interests of the other party. In other words, for the duty to avoid making negligent misrepresentations to arise, the parties must be in a 'special relationship,' in which the party sought to be held liable had some obligation to pursue the interests of the other party." *Conway v. Pacific University*, 324 Or. 231, 236-237 (1996), citing *Onita*, 135 Or. at 159.

In *Conway*, the Oregon Supreme Court held that Conway, a professor who had an employment contract with Pacific University, was not in a special relationship with the University. Specifically, the court found that "Conway did not authorize Pacific University to exercise independent judgment in his behalf, by contract or otherwise, thereby placing him in the position of having a right to rely upon the university." *Id.* at 242.

Here, Wagner has not alleged or come forward with any evidence of a special relationship between himself and PMA, such that PMA owed him a duty "beyond the common law duty to

Page 21 - FINDINGS AND RECOMMENDATION

exercise reasonable care to prevent foreseeable harm." *Onita*, 315 Or. at 159.  In fact, Wagner

has not even responded to PMA's motion against his negligent misrepresentation claim. Wagner

has failed to state a claim for negligent misrepresentation, and PMA should be granted summary

judgment on Wagner's ninth claim for relief.

## VI.    Equitable Estoppel

In his tenth claim for relief, Wagner alleges that PMA should be estopped from taking

actions contrary to the representations made in the 2003 announcement from Weber. The

elements of estoppel are set out in *Lyden v. Goldberg*, 260 Or. 301, 304 (1971):

> "There must (1) be a false representation; (2), it must be made with
> knowledge of the facts; (3) the other party must have been ignorant
> of the truth; (4) it must have been made with the intention that it
> should be acted upon by the other party; and (5) the other party
> must have been induced to act upon it."

*Id.* at 304 (citations omitted).

PMA argues that Wagner's claim fails because he cannot show that he did rely on the

2003 announcement in connection with the 2004 promotions, that he had a right to rely on the

2003 announcement in deciding not to apply for the 2004 selection, or that any such reliance on

his part was justified.  Wagner does not respond to PMA's argument.

With regard to the 2004 selection process, Wagner fails to state a claim for estoppel

because he was informed before the selection process began that he, and all other 2003

applicants, would be required to re-submit their applications for the 2004 selection. *Bradford v.*

*Western Oldsmobile, Inc.*, 222 Or. 440, 451-52 (1960) (Reliance is not justified where a party has

knowledge to the contrary of the fact or representation allegedly relied upon).PMA should be

granted summary judgment on Wagner's tenth claim for relief.

Page 22 - FINDINGS AND RECOMMENDATION

CONCLUSION

For the reasons set forth above, PMA's Motion for Summary Judgment (No. 39) should be granted in part and denied in part as follows: DENIED as to Wagner's Second and Fourth Claims for Relief based on disparate treatment arising out of the 2003 walking boss selection process; and GRANTED as to all other claims.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due August 3, 2007. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this 17th day of July, 2007.


Honorable Paul Papak
United States Magistrate Judge